**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

AMIT AGARWAL,

     *Plaintiff,*               CASE NO. 20-CV-12150

*v.*                       DISTRICT JUDGE THOMAS LUDINGTON
                             MAGISTRATE JUDGE PATRICIA MORRIS

MORBARK, LLC,

     *Defendant.*

_____/

## REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION
## (ECF Nos. 31, 32, 33, 34, 35)

### I.      RECOMMENDATION

For the reasons stated below, I recommend that the term "passive sensor" be construed as "a device that uses coils to modify the electromagnetic field which is sensed by a circuit which converts this stimulus into an output as a consequence of sensed proximity without requiring a power source."

I further recommend that the term "means for stopping the chipping blades and/or the feed rollers in response to the signal" should be construed as "function: stopping the chipping blades and/or the feed rollers in response to the signal" and "structure: the solenoid valve and equivalents."

## II.    <u>REPORT</u>

### A. Background

This case involves alleged infringement of U.S. Patent 6,418,004 (patent) that describes a "safety system utilizing a passive sensor to detect the presence of a hand of a worker and provide a signal to interrupt the operation of a machine" i.e., a mobile wood chipping machine. (ECF No. 1, PageID.15.) Plaintiff is the patent holder by assignment; the patent applicant was Mr. Corey Mather. (ECF No, ECF 31, PageID.388.) The background of the invention explains that serious accidents have occurred in the use of wood chipping machines because "it is possible that a workman may become snared by the material being fed into the chute in which case the workman may be unable to operate the safety bar in time or may be unable to operate the bar at all and as a consequence may be drawn into the machine and injured." (ECF No. 1, PageID.15.) A previously patented solution utilized a metal sensor and metal-impregnated gloves (Mooring patent; Mooring glove). (ECF No. 38, PageID.603.) The current patent involves use of a passive sensor incorporated into a band worn by the user, a sensing coil mounted on one of the walls of the chute and a means for stopping the chipping blades and/or the feed rollers. (ECF No. 38, PageID.604.)

Since the parties dispute the construction of two terms relevant to the claim, a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), was held on May 6, 2021.

## B. Standards

Claim construction is a matter of law for the court to decide. *Markman*, 52 F.3d at 979. "The purpose of claim construction is to give terms the meaning understood by a person of ordinary skill in the art at the time of the invention." *Mass. Inst. of Tech. v. Shire Pharms., Inc*. 839 F.3d 1111, 1118 (Fed. Cir. 2016). This court will defer to the rules of claim construction as set forth in the Federal Circuit's en banc decision in *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005). "It is a 'bedrock principle' of patent law that 'the claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1512 (internal citation omitted). The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312-13. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. There is a "heavy presumption" that claim terms mean what they say and carry their ordinary meaning as viewed by one of ordinary skill in the art. *Lydall Therma/Acoustical, Inc. v. Fed. Mogul Corp.*, 566 F. Supp. 2d 602, 609 (E.D. Mich. 2008). "In some cases, the ordinary meaning of claim language…may be readily apparent even to lay judges"; however, if the meaning of the term as understood by persons skilled in the art is not immediately apparent or is in dispute, the court must consult available sources, including intrinsic and extrinsic evidence. *Phillips*, 415 F.3d at 1314.

Intrinsic evidence, such as the patent claims themselves, the specifications, and prosecution history, is of highest importance. *Phillips*, 415 F.3d at 1314. Extrinsic evidence,

such as dictionaries, treatises, and expert testimony, is "less significant" but still may assist the court in understanding "the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms, USA v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316. If the inventor has given a special definition to a claim term that differs from the meaning it would otherwise possess, the special definition will govern. *Phillips*, 415 F.3d at 1316. The "purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips*, 415 F.3d at 1323. Therefore, the claim specification is "'the single best guide to the meaning of a disputed term,' and…'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" *Phillips*, 415 F.3d at 1321 (internal citation omitted).

"While we have acknowledged the maxim that claims should be construed to pre-serve their validity, we have not applied that principle broadly, and we certainly have not endorsed a regime where validity analysis is a regular component of claim construction. Instead, we have limited the maxim to cases in which 'the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous.'" *Phillips*, 415 F.3d at 1327 (internal citations omitted), Thus, if the claim term is not ambiguous, the

court should construe the term "without the need to consider whether one possible construction would render the claim invalid while the other would not." *Id*.

### C. Analysis

At oral argument, the parties agreed that a person of ordinary skill in the art in this case "would have at least (a) an undergraduate degree in electrical engineering with the requisite familiarity with safety sensors and their integration into larger systems, for example machine safety systems, or (b) several years' experience designing safety systems having safety sensors for machinery, for example wood chippers. In each case, such a person would have been familiar with the state of the art of available safety sensors and their potential use in a wide range of applications involving human-operated machinery." (ECF No. 31, PageID.360.)

In addition, the parties also agreed that the means plus function analysis applied to construction of the "means for stopping chipping blades and/or the feed rollers in response to the signal" but not to construction of the term "passive sensor."

There are two terms that are subject to claim construction: (1) passive sensor; and (2) means for stopping the chipping blades and/or the feed rollers in response to the signal.

### 1. Passive Sensor

During oral argument, the parties agreed that the "passive" word of the term "passive sensor" refers to the fact that the passive sensor does not require a power source. (*Accord*, ECF No. 35, PageID.527.)

Plaintiff suggests that passive sensor should be defined as "a device without a power supply whose proximity is detectable by a sensing coil." (ECF No. 33, PageID.482.) On

the other hand, Defendant proposes that passive sensor be defined as "a device that converts a stimulus into an output without requiring a power source." (ECF No. 33, PageID.482.)

Plaintiff clarifies that "[o]ur disagreement concerns 'sensor'" because Defendant "says a 'sensor' must convert a stimulus into an output." (ECF No. 35, PageID.528.) Plaintiff contends that "if this Court accepts or even modifies Morbark's proposal and determines that the passive sensor must interact with a stimulus in some manner (receiving it, responding to it, converting it, etc.) then it is – in essence – concluding that the passive sensor receives a stimulus from some other source. In the context of this invention, the only plausible source could be an energized version of the sensing coil. Indeed, that is the only structure mentioned in Pat. 6,418,004 as providing such a stimulus signal – the energized coil." (ECF No. 35, PageID.528.) [1]

Plaintiff argues that a "non-energized coil of wire, is therefore, within the claim scope of 'sensing coil'" and that a "person of ordinary skill in the art would not even pause to contemplate whether a non-energized sensing coil is capable of birthing a stimulus signal." (ECF No. 35, PageID.529.) Plaintiff further states "[n]or would an artisan insist on a sensor interacting with a stimulus signal in some manner just because some dictionaries define the word 'sensor' in that manner…This does not involve a stand-alone sensor…An operator armed with a passive sensor would be undetectable to a wood chipper without a sensing coil. Conversely, an operator without a passive sensor would be undetectable to

---

[1] Plaintiff notes that the parties have "arrived at an agreement on the proper claim construction for sensing coil" i.e., "'a coil of wire for detecting proximity of the passive sensor.'" (ECF No. 35, PageID.529.)

the wood chipper with a sensing coil. These two devices work together to enable the wood chipper to sense human proximity…the two-part sensing system satisfies the various dictionary definitions Morbark cites because, as a combination, they convert a stimulus (human proximity to the chipper) into the signal generated by the sensing coil." (ECF No. 35, PageID.529.)

Plaintiff contends that "calling the object of detection a 'sensor,' i.e., by calling the detect<u>ed</u> device as opposed to the detect<u>ing</u> device a sensor, the inventors aren't acting in some idiosyncratic manner or deviating from convention at all." (ECF No. 35, PageID.529) (emphasis in original). Plaintiff cites to other examples, from medical devices to garages, where "in the field of proximity" using the word "'sensor' to describe the object of detection in a two-device detection pair deployed to detect inter-device proximity" conforms with convention. (ECF No. 35, PageID.530-531.)

Plaintiff concludes that the "claims in question do not require the sensor to receive and respond to a stimulus, convert a stimulus, or perform any other step to render itself detectable to the sensing coil. The sensing coil, in contrast, is tasked in the body of claims using clear and unambiguous language to generate a signal whenever the passive sensor is in the passage. The specific mechanism or physics underlying the interaction between the detection pair in question, i.e., the passive sensor and sensing coil, does not correspond to any claim limitation. The Court should not *write it into* the body of the claims. The entire class of devices detectable to the sensing coil are 'passive sensors' so long as they do not require any power source or supply. Narrowing this class to some sub-class that converts

stimulus or responds to stimulus is improper…" (ECF No. 35, PageID.533-534) (emphasis in original).

At oral argument, Plaintiff continued to emphasize that the sensor does not have to do the detecting but instead can be the item that is detected. Plaintiff acknowledged that the patent applicant (Mr. Mather) agreed with the patent examiner that the Mooring metal glove is not a passive sensor, thereby distinguishing and validating the instant patent as involving different technology. However, Plaintiff argued that this prosecution history should not control the instant claim construction. Plaintiff further ceded that if the definition of passive sensor is construed such that it could include the Mooring glove, the patent may be invalid. Nevertheless, Plaintiff seeks this broader construction even if such construction eviscerates the patent as to any future use.[2]

The court asked Plaintiff to apply his construction and specifically asked whether a metal-impregnated glove would fit under the definition of passive sensor; Plaintiff indicated it would not. But, when asked whether a piece of metal placed in a band worn around a wrist or arm, i.e., metal-impregnated wrist or arm band, would meet the definition of passive sensor, Plaintiff indicated that it would.

Defendant counters that in the previous prosecution,[3] the Mooring metal impregnated glove "'whose presence will automatically be identified by a metal sensor'" was "not a 'passive sensor.'" (ECF No. 34, PageID.485) (emphasis in original). Defendant notes that

---

[2] I note that if Plaintiff were the assignor, rather than the assignee, the Court would need to determine whether assignor estoppel would apply. *Minerva Surgical, Inc. v. Hologic, Inc*., 141 S. Ct. 2298 (2021).
[3] The previous prosecution was one that began in the Middle District of Florida (8:17-cv-00133), was transferred to the Eastern District of Michigan and was dismissed without prejudice at Plaintiff's request pursuant to a stipulated order. Case number 1:17-cv-11851 (E.D. Mich.); (ECF No. 31, PageID.326, n.3.)

in the previous prosecution, "the inventors and the examiner were of one accord: the full scope of 'passive sensor,' however defined, cannot include a metal impregnated glove whose proximity is detectable by a sensing coil" as argued by Plaintiff, citing *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (precluding patentees "from recapturing through claim interpretation specific meanings disclosed during prosecution."). Defendant further argues that "Plaintiff's recycling of this function (being detectable) in its construction for 'passive sensor' is an attempt to sidestep construction and read 'sensor' out of the claims." (ECF No. 34, PageID.487.)

I first find that the sensor, as described in the current patent specification, is an item that is detected. Plaintiff emphasized that a sensor does not have to be the item doing the detecting but rather can be the item that is detected. I agree with Plaintiff on this general statement. However, I find that Plaintiff strays when he goes on to conclude that nearly anything that can be detected would fit the definition of passive sensor. Plaintiff agreed that the Mooring glove would not fit the definition of passive sensor in the instant patent. But then Plaintiff indicated that a metal impregnated band worn on the wrist or arm would somehow fit the definition of passive sensor in the instant patent. The court continues to see no principled basis for distinguishing a metal-impregnated glove from a metal-impregnated band worn on the wrist or arm.

In addition, if the Court were to construe the term as Plaintiff suggests, it would have to ignore the fact that the current art requires more than a metal-impregnated item. The passive sensor as described in the instant patent has a coil that modifies the electromagnetic field. (ECF No. 1, PageID.16.)   A mere metal impregnated item would not

9

necessarily contain a coil that modifies the electromagnetic field. To construe the term passive sensor to include mere metal-impregnated items would be to overlook the distinguishing characteristic of the instant patent: the coil that modifies the electromagnetic field produced by the coil which is sensed by the circuit which provides an output as a consequence of the sensed proximity. (ECF No. 1, PageID.16; ECF No. 38, PageID.614-617.) Even if this construction is a special definition that may be different from its ordinary meaning, "the special definition will govern." *Phillips*, 415 F.3d at 1316.

I find these conclusions are supported by the previous prosecution wherein Plaintiff agreed that the Mooring metal impregnated glove "'whose presence will automatically be identified by a metal sensor'" was "<u>not</u> a 'passive sensor.'" (ECF No. 34, PageID.485) (emphasis in original). In addition, Plaintiff's proposed construction is inconsistent with the language of the specification itself. The description given in the claim specification instructs that "[t]he passive sensor coils worn by the machine operator function to modify the electromagnetic field produced by coil 32 whenever the passive sensor coils are close enough to the coil. This modification of the field of coil 32 is sensed by the circuit 40 which provides an output as a consequence of the sensed proximity. That output is used to drive a switching circuit consisting of transitors Q1, Q2 and Q3 and a relay having a coil R1 and a contact C1." ECF No. 1, PageID.16. The claim specification is "'the single best guide to the meaning of a disputed term,' and…'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" *Phillips*, 415 F.3d at 1321 (internal citation omitted). The instant claim specification requires more than a metal-impregnated item that is capable of being sensed; it requires coils worn by the machine

operator which modify the electromagnetic field. Therefore, I find the proper construction of the term must also contain some reference to coils worn by the operator which modify the electromagnetic field, which is then sensed by the circuit causing the circuit to produce an output.

I therefore find that the proper construction of the term "passive sensor" should be "a device that uses coils to modify the electromagnetic field which is sensed by a circuit which converts this stimulus into an output as a consequence of sensed proximity without requiring a power source."

### 2.  Means for stopping the chipping blades and/or feed rollers

At oral argument, the parties agreed that the construction of this term requires a means-plus-function analysis.[4] Plaintiff suggests that "means for stopping the chipping blades and/or the feed rollers in response to the signal" be defined as "function: stopping the chipping blades and/or the feed rollers in response to the signal" and "structure: solenoid valve and equivalents." (ECF No. 33, pageID.482.) Defendant proposes "function: to stop the chipping blades and/or the feed rollers in response to the signal generated by the sensing coil" and "structure: an alarm circuit board (receiver switch RX SWi, receiver RX, digitizer, microprocessor), a relay switching circuit (transistors Q1, Q2, Q3, relay R1, relay R2), a solenoid valve, and two hydraulic motors." (ECF No. 33, pageID.482.)

---

[4] Defendant notes that the claim was "redrafted as a mean-plus-function limitation" from its original presentation. (ECF No. 38, PageID.633.)

Since the definitions are virtually identical as to the function component, the parties agreed at oral argument that "the function is stopping the chipping blades and/or feed rollers in response to the signal." (*Accord*, ECF No. 35, PageID.537.)

Claim construction as to the structure remains at issue. Plaintiff contends that Defendant's analysis and expert declaration are made under the wrong legal standard because Defendant "asked its expert to determine which structures were 'necessary for' performing the function." (ECF No. 35, PageID.534.) Plaintiff relies on *Default Proof Credit Card System, Inc. v. Home Depot USA, Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005), wherein the court stated that "corresponding structure need not include all things necessary to enable the claimed invention to work…" (ECF No. 35, PageID.534.) Plaintiff further cites *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) to support his argument: "An electrical outlet enables a toaster to work, but the outlet is not for that reason considered part of the toaster. The corresponding structure to a function set forth in a means-plus-function limitation must clearly perform the recited function, not merely enable the pertinent structure to operate as intended[.]" (ECF No. 35, PageID.537.) Plaintiff then cites the patent language[5] and concludes that the "solenoid valve is the only electromechanical device in the entire invention which does both (1) receive an electrical signal which is an electrical function; and (2) perform a mechanical task of obstructing the flow of fluid to the hydraulic motor driving the feed rollers." (ECF No. 35, PageID.539.)

---

[5] The language cited is as follows: "The safety solenoid valve 3 is normally energized and is de-energised whenever the hands of machine operator are detected close to an area within the feed chute 10 of the chipping machine 9. When valve 3 is de-energised, it returns to the position shown in FIG. 3 and motors 6 no longer rotate and the feed rollers 11 cease their rotation." (ECF No. 1, PageID.16.)

Defendant contends that "in the Florida litigation, Plaintiff asserted that the 'corresponding structure' was 'an emergency stop switch SW1'" and that the "stop switch, not the solenoid valve, was 'necessary to stop the chipping blades and/or feed rollers in response to the signal generated by the sensing coil.'" (ECF No. 34, PageID.491.) Defendant notes that "there is not a single element that constitutes the requisite structure for performing the stated function. Rather, the Specification clearly sets forth the requisite structure that forms the necessary causal chain 'for stopping the chipping blades and/or the feed rollers in response to the signal.' The causal chain begins at the signal from the sensing coil and ends at the chipping blades and/or feed rollers. The causal chain includes (a) the alarm circuit, for receiving the signal from the sensing coil, (b) the relay switching circuit, for receiving the output of the alarm circuit, (c) the solenoid valve, for receiving the output of the relay switching circuit, and (d) the hydraulic motors, which cease rotation of the feed rollers when the solenoid valve is actuated." (ECF No. 34, PageID.491-492; ECF No. 38, PageID.640.) Defendant further argues that even "if the Court were to determine that the only one structural element comprises the Specification's corresponding structure, the alarm circuit 40 is plainly that structural element, on the basis that alarm circuit 40 is the only structural element that responds to the signal generated by the sensing coil 32. The remaining elements implement the alarm circuit's command that the chipping blades and/or feed rollers be stopped. This is confirmed by the fact that, during prosecution, the inventors introduced the mean-plus-function language in place of 'control circuitry responsive to the sensing coil for providing a control signal for use in stopping operation of the machine' from original claim 1." (ECF No. 34, PageID.493.)

Plaintiff stressed, at oral argument, that the solenoid valve is the only link between the circuit (electrical function) and the motors (mechanical/hydraulic function). Both parties agree that the electrical system responds to the signal/alarm generated when proximity is sensed, the solenoid valve then mechanically obstructs oil/hydraulic fluid from flowing, causing the motor/mechanical system to stop operating because of a lack of oil. This indirectly causes the chipping blades and rollers to stop but the solenoid valve does not directly stop the chipping blades or rollers. Nor does the solenoid valve respond to the signal from the sensing coil, instead it responds to the output of the circuit after the circuit responds to the alarm.

A district judge in our district has aptly and succinctly described the manner in which means-plus-function terms are to be viewed and construed:

> A means-plus-function claim is one drafted in a manner that involves 25 U.S.C. §112(f), which provides that an element in a claim 'may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.' *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). By enacting this provision, Congress balanced the interest in allowing inventors to express a claim limitation by reciting a function to be performed (rather than a structure for performing that function) while also containing the manner in which such a limitation would be construed, 'namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.' *Id.* (citing *Northrop Grumman Corp. v. Intel Corp.*, 735 F.3d 1346, 1350 (Fed. Cir. 2003)). Put another way, a means-plus-function claim limitation is a type of claim that allows an inventor to set forth a function to be performed without setting forth the specific structure to accomplish the function. The flexibility built into this type of claim comes at a price for the inventor as means-plus-function claims are construed to cover only 'the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.' *Williamson*, 792 F.3d at 1347-48.

14

*Zak v. Facebook, Inc.*, 2020 WL 589433, at \*6 (E.D. Mich. Feb. 6, 2020). In keeping with the above description as to how a means-plus-function term operates, the instant specification does not set forth a specific structure to accomplish the task. The specification refers to a "means for stopping the chipping blades and/or the feed rollers in response to the signal" but does not describe the means with any specificity. (ECF No. 1, PageID.16.) The specification simply explains that the "safety solenoid valve 3 is normally energised and is de-energised whenever the hands of [a] machine operator are detected close to an area within the feed chute of the chipping machine 9. When valve 3 is de-energised, it returns to the position shown in FIG. 3 and motors no longer rotate and the feed rollers 11 cease their rotation." (ECF No. 1, PageID.16.) Therefore, the specification supports Plaintiff's construction that the necessary function requires the solenoid valve and its equivalents alone.

Defendant contends that if the court does not agree with its argument that all four components are needed to describe the structure, then the alarm circuit is plainly that structural element because it is the only structural element that responds to the signal generated by the sensing coil. (ECF No. 34, PageID.493.) However, the alarm circuit does not directly or indirectly stop the chipping blades or feed rollers so that construction does not conform with the term. Although Defendant contends that the remaining elements implement the alarm circuit's command that the chipping blades and/or feed rollers be stopped (*id.*), such a description is misleading. The claim does not consist of an alarm that commands and causes chipping blades and/or feed rollers to cease. The alarm circuit speaks to the solenoid valve and it is the solenoid valve that stops the fluid/oil from flowing, causing the motor to

15

stop and the chipping blades and/or rollers to also cease moving. Defendant argues that its construction is supported by the fact that the inventors substituted the mean-plus-function language in place of the more specific language: "'control circuitry responsive to the sensing coil for providing a control signal for use in stopping operation of the machine' from original claim 1." (ECF No. 34, PageID.493.)  However, the change from describing a specific structure to accomplish the task to a means-plus-function claim shows that the inventors chose not to require any specific structure (control circuitry) to signal the solenoid valve to accomplish the task of ending the flow of hydraulic fluid/oil which in turn causes the chipping blades and/or rollers to stop functioning. Since the inventor chose the mean-plus-function claim over the prior wording, the other elements in the causal chain described by Defendant were purposely omitted, i.e., alarm circuit, relay switching circuit and hydraulic motors. (ECF No. 34, PageID.491-492; ECF No. 38, PageID.640.) Although these other links in the causal chain may enable the structure to operate, they are not the only means nor are they necessary to perform the function. *Asyst Techs.*, 268 F.3d at 371.

 I therefore conclude that the term "means for stopping the chipping blades and/or the feed rollers in response to the signal" should be construed as follows:

Function: "stopping the chipping blades and/or the feed rollers in response to the signal"

Structure: "the solenoid valve and equivalents."

**D.  Conclusion**

For the reasons stated above, I recommend that the term "passive sensor" be construed as "a device that uses coils to modify the electromagnetic field which is sensed by a

circuit which converts this stimulus into an output as a consequence of sensed proximity without requiring a power source."

I further recommend that the term "means for stopping the chipping blades and/or the feed rollers in response to the signal" should be construed as "function: stopping the chipping blades and/or the feed rollers in response to the signal" and "structure: the solenoid valve and equivalents."

### III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to

which it pertains. Not later than 14 days after service of an objection, the opposing party

may file a concise response proportionate to the objections in length and complexity. Fed.

R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each

issue raised in the objections, in the same order, and labeled as "Response to Objection

No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date:  August 31, 2021                                    s/ Patricia T. Morris
                                                          Patricia T. Morris
                                                          United States Magistrate Judge